IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 6, 2007

**FREDDIE T. INMAN, JR. v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for McNairy County**
**No. 1656      J. Weber McCraw, Judge**

_____

**No. W2007-00687-CCA-R3-PC  - Filed February 19, 2008**

_____

The petitioner, Freddie T. Inman, Jr., sought post-conviction relief from his conviction of theft of property having a value of more than $1,000 but less than $10,000.  The McNairy County Circuit Court denied relief after an evidentiary hearing.  On appeal, the petitioner argues that he received ineffective assistance of counsel because trial counsel failed to subpoena and call three witnesses at trial.  We affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ. joined.

James N. Adams, Corinth, Mississippi, for the appellant, Freddie T. Inman, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; and Bob G. Gray, Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

The defendant was indicted for theft of property having a value of more than $1,000 but less than $10,000, *see* T.C.A. § 39-14-105(3) (2006), specifically truck mirrors and taillight assemblies that he stole from his employer, Reitter & Schefenacker USA ("Schefenacker"), in Selmer, Tennessee, between December, 2001 and April, 2002.[1]  He was convicted by a jury of the offense, and on March 12, 2004, the trial court imposed a twelve-year sentence.

The following facts come from this court's opinion on direct appeal:

---

[1]We cite to the 2006 volume of the Tennessee Code Annotated because there has been no change to § 39-14-105(3) since the time of the offense.

The State's first witness, James Dunn, testified that he operated Dunn's Used Cars and Parts, a salvage yard, in Corinth, Mississippi, between December 2001 and April 2002 but was currently serving a sentence in the Corinth City Jail on a state conviction for operating a "chop shop." . . . . Dunn stated that he bought truck mirrors and taillight assemblies "from a fellow telling [him] that he was Freddie Inman." The person who sold him the automotive parts went by the name of "T.J. Inman" and was accompanied by a "black guy." The defendant first came to his shop offering to sell the parts in December 2001, and Dunn bought approximately twenty-five sets of mirrors and four or five taillights for $500. A few weeks later, the defendant returned in a pickup truck, and Dunn bought thirty to thirty-five pairs of mirrors for $300. The defendant returned a third time with more mirrors and offered to sell them for fifty cents each, but Dunn told the defendant he had all he needed. . . . . Eventually, two men and a woman came to his business and asked to buy mirrors. After looking at some mirrors, the lady identified herself as "a Butler" and said she was from Schefenacker and that the mirrors were stolen. Dunn told her she could not take all of the mirrors that he had in stock but gave her one pair for identification purposes. Later, Dunn called the sheriff's department in Corinth who told him "to hold onto them until some kind of law official did [sic] come and get them." A few days later, a city policeman came to the salvage yard and recovered sixty-four pairs of mirrors and five taillight assemblies purportedly belonging to Schefenacker. Dunn stated he believed he had bought sixty-five pairs of mirrors and four or five taillight assemblies from the defendant, and he had sold "two or three pair of mirrors." On cross-examination, Dunn stated that he could not "swear that this man here [the defendant] and the one that come to the shop are the same person," as it had been almost three years since he bought the parts from the defendant.

Russell Haney, the owner of Highway 64 Motor Company in Selmer, Tennessee, testified that he sells automobiles and various truck accessories. He stated that between December 2001 and April 2002, he bought Chevrolet Silverado and Dodge truck mirrors from the defendant. The defendant came to Haney's business "two to six times" selling mirrors, and Haney bought a total of fifty sets of mirrors, for which he paid the defendant $15 to $20 per set. Later, a man and a woman came to his shop, identifying themselves as Schefenacker employees and the mirrors as company property. Law enforcement officers subsequently advised Haney that the

mirrors were stolen. The police recovered at least twenty-five sets of mirrors from Haney's business. On cross-examination, Haney testified that the defendant told him the mirrors were scrap parts which had been discarded by Schefenacker, and some of the mirrors actually had scratches on them. He also had bought scrap parts in the past from other Schefenacker employees. Haney identified the defendant in court as the seller of the parts.

Jason Rodotz, an employee of Schefenacker since December 2000, testified that he was the warehouse supervisor from October 2001 until October 2002. During that time, Schefenacker operated two "off-site" warehouses, the "old Henco Furniture warehouse" and the TRM building in Selmer. Rodotz supervised the defendant at both warehouses, and the defendant worked "odd" and "unusual" hours early in the mornings. Often, the defendant, who had his own key, worked alone in the warehouses. Finished products, including mirrors for Chevrolet and Dodge trucks, were stored at the TRM warehouse, and the defendant was a material handler whose job entailed, among other things, unloading trucks coming from the manufacturing plant to the warehouse. Products damaged during manufacture were placed in a scrap area in the plant to be torn down and reclaimed or destroyed. Defective parts were not sent to the warehouse, nor were they intentionally shipped to customers. In addition, defective or damaged parts were not given to employees, nor were they thrown away where others could access them.

Between December 2001 and April 2002, the company received numerous complaints from customers concerning orders which were short of parts. Someone placed a "tip" in the employees suggestion box as to where the missing products could be found, and Rodotz later helped recover them. Rodotz stated that he never gave the defendant permission to take parts from the warehouse or the manufacturing plant.

On cross-examination, Rodotz could not remember the exact date he began supervising the defendant but recalled that the defendant began helping transfer parts from the Henco building to the new TRM building in January 2002. He did not recall the defendant and a person named Glenn Jernigan assisting him in removing parts left in the Henco warehouse during the transition. Rodotz acknowledged that he testified at the preliminary hearing that there may have been occasions when he told employees to throw things in the dumpster but may not have followed up to make sure his orders

were followed. He denied that the defendant ever said, "We're throwing these in the dumpster, can I just have them?" or that he responded, "I don't care; get rid of them." Later, he testified that he followed up on his orders to destroy damaged and scrap parts "ninety-nine percent of the time." On redirect, he said that the parts recovered from Dunn's and Haney's businesses were new parts manufactured "around April and May of 2002," and new production would not have been thrown into the dumpster.

Donna Butler, former Director of Human Resources at Schefenacker, testified that the company began receiving complaints of shorted orders from customers in early 2002, and she described the steps taken in the manufacturing plant to solve the problem. She said that the company would "absolutely not" have given away parts to employees or thrown them into the dumpsters, especially in light of the demand from customers at the time. Someone placed an anonymous tip in the employees' suggestion box indicating that missing parts could be found at Dunn's in Corinth, Mississippi. Butler telephoned Dunn and inquired about a certain mirror, which Dunn said he had in stock. Butler said that was "fishy," as the mirror about which she inquired had just been placed in production. They then went to Dunn's business, where he explained how he came into possession of the mirrors and told them about Highway 64 Motor Company. In addition, Dunn gave a description of the defendant and the vehicle he drove. Butler contacted Investigator Roger Rickman of the Selmer Police Department, and he accompanied them to Highway 64 Motor Company, where they recovered more mirrors and Haney advised them that the defendant had sold him the mirrors. Butler stated neither she nor anyone else gave the defendant permission to take parts from the company. On cross-examination, she stated that damaged or scratched parts were never thrown in the dumpster but were torn apart for refurbishing or recycling.

Kenneth McDonald, a technical engineer and manager at Schefenacker, testified [that the] . . . company was able to recover between $5,500 and $5,600 worth of products from the two businesses, and complaints from customers concerning shortages had not been a problem since the defendant's termination. At the time of the thefts, the defendant, who had his own key to the warehouse, loaded most of the trucks and pulled products in the warehouse for shipping to customers. The recovered mirrors were newly produced and contained "date, code and time stamps," as well as "end-of-the-

-4-

line signatures" indicating that the mirrors had passed final inspection. McDonald did not give anyone permission to take products from the warehouse, and no one had permission to toss the "good currently produced mirrors into the dumpster." On cross-examination, he stated that he had no knowledge of customer complaints concerning missing parts before December 2001. Any parts damaged at the warehouse would have been returned to the manufacturing plant for reclamation of usable parts and destruction of unusable parts. He recalled that Rodotz, Quinn Jernigan, and a [Mr. Inman] assisted in organizing the TRM warehouse when it opened in mid-2001. However, he also stated that when products were moved from the Henco warehouse to the TRM warehouse, none of the products would have been thrown into dumpsters.

Roger Rickman, a Selmer Police Department Criminal Investigator, testified that Butler advised him of the "tip" in the suggestion box as well as the results of their trip to Corinth, Mississippi. Rickman went with the Schefenacker employees to Highway 64 Motor Company and recovered the mirrors from Haney. Two days later, he went to Dunn's and recovered the remainder of the mirrors. Based on his interviews with Dunn and Haney, he arrested the defendant. After advising the defendant of his rights, Rickman took a written and signed statement from the defendant, which he read to the jury, with the defendant admitting to selling mirrors belonging to Schefenacker . . . .

Greg Galloway, testifying for the defense, stated that he was a quality manager at Schefenacker. He recalled that the defendant and his supervisor at the time, Darrell Ingel, had approached him and asked if they could have a set of Chrysler doors that had been used for testing, and he gave them the doors. Also, there were times when employees asked for "a mirror or something" for their cars and were given a scratched or damaged product. Between December 2001 and April 2002, his "general thought" was that some rejected materials were discarded in a dumpster at the warehouse. However, on cross-examination, he stated that complete, assembled mirror sets which were damaged were not thrown into the dumpster but were disassembled and reused. At no time would a complete assembly be thrown into the dumpster. He also stated that the set of doors he gave the defendant was manufactured by Chrysler and sent to Schefenacker for use with mirror tests, and he gave them to the defendant only after the tests were completed . . . .

*State v. Freddie T. Inman*, No. W2004-02371-CCA-R3-CD, silp op. at 2-12 (Tenn. Crim. App., Jackson, Mar. 30, 2005) (footnotes omitted). We affirmed the judgment of the trial court on March 30, 2005. *Id* at 34.

The defendant filed a petition for post-conviction relief on April 10, 2006.[2] An evidentiary hearing was held on January 12, 2007, and the post-conviction court denied the petition on January 29, 2007.

The defendant's original lead counsel was called to testify. Lead counsel testified that before the trial, attempts to contact the defendant personally failed because "he would not make himself available." Lead counsel was aware that the defendant had witnesses he wanted to call at trial, but she never received addresses to contact them. She communicated with the defendant primarily through conversations with the defendant's wife.

A "few days" before the original trial, lead counsel "finally obtained some addresses" from the defendant for subpoenas, which were then issued "out of an abundance of caution." Lead counsel testified that she served a subpoena on Glenn Jernigan on February 18, 2004, the day before the original trial date. A subpoena issued for Darrel Ingle on February 18, 2004, was not returned. When the trial was reset for February 25, 2004, lead counsel issued new subpoenas for Mr. Jernigan and Mr. Ingle on February 24, 2004, but did not serve them. When lead counsel asked for a continuance due to the absence of Mr. Jernigan, the court refused because of the "lateness of the subpoenas."

Lead counsel testified that she contacted the potential witnesses for whom she had phone numbers, but that "[a] lot of the problem was that a lot of the people that would have been witnesses for [the defendant] were still employed at Schefenacker and feared for their employment." Additionally, lead counsel did not think the defendant could testify because of his twenty-one prior felony convictions involving burglary and theft. Lead counsel believed Mr. Jernigan would have been a good witness but did not think that he would have been able to convince the jury that the defendant did not commit theft.

Lead counsel testified that she had no recollection of meeting with or subpoenaing Kevin King but admitted it was possible given that the events took place three years before. Lead counsel testified that at the end of the trial, Mr. King "came forward after the trial of the defendant to state that [he], too, had been given parts while employed at Schefenacker."

Kevin King testified at the post-conviction hearing that he was at the trial and informed lead counsel prior to the trial that Jason Rodotz told the defendant "if it's in the dumpster or out here, take it, it's yours." He testified that lead counsel replied, "Well, if we need you, I'll call you." On cross examination, Mr. King admitted that he had never worked with the defendant and

---

[2] Although not filed until April 10, 2006, the petition for post-conviction relief was notarized on March 30, 2006. If mailed on that date, it would have been timely filed under the "mailbox rule". *See* Tenn. R. Crim. P. 49(d).

was only there to pick up some spare boxes for himself. Mr. King admitted to a prior conviction of accessory to robbery in 1991.

The defendant testified that he told lead counsel about Mr. King before the original trial. However, he thought that another employee, Wade Van Hoos, would have been an even better witness. He testified that Mr. Van Hoos was "unfindable" at the time. He testified that most of the communication with lead counsel was through his wife because he was working sixty hours a week. On cross-examination, he acknowledged that Mr. Van Hoos was in jail at the time of the original trial. When asked how lead counsel was supposed to find potential witnesses without contact information, he testified that he made an effort to supply sufficient information but he did not know the witnesses personally.

The State then recalled lead counsel to testify. Lead counsel testified that she had been in private practice for 20 years, primarily in criminal and family law, with an estimate of over 1000 trials. Lead counsel testified that this case followed the normal process of pre-trial motions, investigation, and discovery and that the defense received no plea offers. Lead counsel testified that the defendant maintained his innocence and claimed that Jason Rodotz told him he could take certain items. However, at trial, the evidence indicated that the defendant had taken "a lot more numbers than he admitted to taking." In particular, an engineer who testified for the State "was very convincing,"

> His testimony was that this was an ongoing problem at the factory, that they had – that they were getting calls that they were being – orders were being shorted, people were getting orders that were coming back that were short, and that they had started an investigation but a lot of items were missing.

> The engineer, the thing that really was most disturbing to me was his testimony that they wouldn't have thrown out perfectly good sets of things. They would have taken it and done the reclamation where they would have gotten anything that could have possibly been used out of the item that they were manufacturing so that they could use it in the manufacture of other items. They wouldn't have tossed out perfectly good sets of things.

Lead counsel testified that she made a point to explain to the defendant's wife that they needed contact information for potential witnesses. "I can't subpoena people that I don't have addresses for that I don't know and then he says he knows names . . . . I can't prove a case if someone can't give me . . . information that is important to their defense." On request, lead counsel prepared a subpoena that had "Wade Van Hoos at large. His probation officer will serve him." After the trial, lead counsel received a list from the defendant's wife containing names of people to subpoena for the next trial and the topics about which they could testify. This document says, "DOC

plate/skids of cardboard" when referring to Mr. King and contains no mention of his being able to directly contradict testimony of Mr. Rodotz.

The trial court denied the petition for post-conviction relief, citing the fact that Mr. Jernigan and Mr. Ingle did not appear at the post-conviction hearing and that the testimony of Mr. King, a convicted felon, was not credible. Furthermore, the court specifically accredited the testimony of lead counsel.

On appeal, the only argument the petitioner raises is that trial counsel was ineffective for failing to utilize potential witnesses Kevin King, Darrel Ingle, and Glen Jernigan at trial. Because the post-conviction court's denial of relief is supported in the record, we affirm that court's judgment.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

The Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975). "Claims of ineffective assistance of counsel are considered mixed questions of law and fact and are subject to de novo review." *Serrano v. State*, 133 S.W.3d 599, 603 (Tenn. 2004); *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999) When a defendant claims ineffective assistance of counsel, the court must determine (1) whether counsel's performance was within the range of competence demanded of attorneys in criminal cases, *Baxter*, 523 S.W.2d at 936, and (2) whether any deficient performance prejudiced the petitioner, *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984); *see also Powers v. State*, 942 S.W.2d 551, 557 (Tenn. Crim. App. 1996). Courts need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley*, 960 S.W.2d at 580.

A reviewing court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2070. This court should not second-guess informed tactical and strategic decisions by defense counsel. *Henley*, 960 S.W.2d at 579. It must evaluate counsel's performance from counsel's perspective at the time of the alleged error and in light of the totality of the evidence. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2070.

However, this court's deference to counsel's tactical decisions will depend upon counsel's adequate investigation of defense options. *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct.

-8-

3114, 3126 (1987). Assuming adequate investigation, the fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. *Thompson v. State*, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997); *Jerry Whiteside Dickerson v. State*, No. 03C01-9710-CR-00472, slip op. at 3 (Tenn. Crim. App., Knoxville, Sept. 16, 1998).

In sum, a defendant is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). To show prejudice, the petitioner must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

Furthermore, "[w]hen a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Generally, presenting such witnesses in the post-conviction hearing is the only way a petitioner can establish that "the failure to discover or interview a witness inured to his prejudice . . . or . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*. Accordingly, a petitioner who establishes that trial counsel deficiently performed by failing to investigate or call witnesses is entitled to no relief "unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Id*. at 757-58.

Our analysis of the issues on appeal need not be protracted. The record supports the post-conviction court's determination that the petitioner failed to establish his claims of ineffective assistance of counsel by clear and convincing evidence, and we agree that the petitioner's evidence in the evidentiary hearing was neither clear nor convincing. The claims that trial counsel failed to utilize witnesses Darrel Ingle and Glen Jernigan were not supported by any post-conviction testimony of such witnesses, and the claim that counsel failed to utilize potential witness Kevin King was dissipated by not only counsel's testimony that the testimony would not have been beneficial, but also the finding by the post-conviction court that "the testimony of Mr. King, a convicted felon, [was not] persuasive or credible." Thus, the petitioner failed to establish prejudice with respect to trial counsel's failure to use any or all of the three prospective witnesses at trial.

Having reviewed the petitioner's claims for post-conviction relief and holding that the record supports the post-conviction court's denial of his claims, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE